## MACON CONSOLIDATED STREET RAILROAD CO. *v.* MAYOR AND COUNCIL OF THE CITY OF MACON.

1. Courts will not enjoin a municipal corporation from performing an act within the scope of its authority and discretion, when the act is neither unreasonable nor arbitrary.
2. A municipal corporation can not make a valid contract abrogating or restricting its legislative or discretionary power; and an agreement by which a city undertakes to divest itself of such power can not be used as the foundation for an estoppel against it.

Argued February 8, — Decided February 26, 1901.

Petition for injunction. Before Judge Felton. Bibb superior court. September 6, 1900.

*Bacon, Miller & Brunson*, for plaintiff.

*Minter Wimberly* and *C. H. Hall Jr.*, for defendant.

COBB, J.　The Macon City and Suburban Railway Company laid one of its lines of railway in one of the streets of the City of Macon, under and by virtue of a contract between it and the city.　Subsequently the Macon Consolidated Street Railroad Company acquired the rights and franchises of the Macon City and Suburban Railway Company.　Thereafter, on July 26, 1899, the legislative body of the city passed a resolution requiring the street-railway company to remove its tracks from the side to the center of a named street. On May 29, 1900, this resolution was repealed, the change required to be made by the first resolution never having been made.　On June 19, 1900, the city rescinded its action of May 29, 1900, and served the railway company with notice that it must move its tracks as required by the original resolution of July 26, 1899.　This action was taken pursuant to a recommendation of the street committee.　Thereafter the street-railway company brought its petition for an injunction to restrain the Mayor and Council of the City of Macon from requiring the petitioner to move its tracks.　The injunction having been refused, the petitioner excepted.

1. It is contended on behalf of the street-railway company that the resolution requiring it to change the location of its tracks is unreasonable, and that for this reason its enforcement should be enjoined.　It has not been, and we do not think it could be with any degree of plausibility, contended that the City of Macon did not have authority to require the railway company to make any reasonable change in the location of its tracks in a given street.　The State has delegated to the City of Macon authority over its streets. It has a right, under its charter, to grant to a street-railway company authority to lay its tracks in these streets; but any such grant is necessarily subject to the power of the city to make any reasonable regulation of its use.　"A railroad company which secures the right to use the streets of a city takes such right subject to all reasonable regulations and ordinances enacted by the city in the exercise of its police power."　Elliott's Roads & Streets, § 807.　See also Booth, St. Rwy. L. § 222.　"The power of a municipal corporation to make police regulations includes authority to make reasonable provision for the peace, safety, and convenience of its inhabitants. Such regulations usually concern the use of streets, either by indi-

viduals or by corporations with railway cars." 15 Am. & Eng. Enc. L. (1st ed.) 1167. These principles are well settled, but it is equally settled that, having granted a railway company permission to lay its tracks in the streets, the municipal authorities can not prevent the successful enjoyment of the franchise. In cases, therefore, of municipal regulation of the manner in which a street-railway company may enjoy the privilege granted to it to use the streets, the question often arises as to whether the regulation is a legitimate exercise of the police power of the city, or whether it really amounts to an unwarranted interference with the franchise. "As applied to the control of street-railways, the police power is the continuing and paramount authority of the legislature, within its constitutional prerogatives, and of municipal corporations, under their delegated powers, to establish regulations which promote the public welfare, do not unreasonably interfere with the franchise, management or business of the company, or violate the obligations of any valid contract." Booth, St. Rwy. L. § 220, p. 302. Every municipal regulation which does not amount to a deprivation or impairment of the franchise will be upheld, unless it is unreasonable and arbitrary. The discretion of the municipal authorities as to these matters is very broad, and it will not be interfered with save in the case just mentioned. Is a regulation by a city requiring a street-railroad company to remove its tracks from one part of a street to another a legitimate exercise of its legislative power ? We think it is, provided the proposed change is not arbitrarily and capriciously required by the city, but is really necessary for the convenience and welfare of the public. See, in this connection, Elliott's Roads & Streets, § 760; Booth, St. Rwy. L. § 62. The municipal authorities must necessarily, in the exercise of their discretion, be left to determine the necessity and propriety of the proposed change. The courts will not readily interfere with the governing authorities of a city in the performance of a discretionary act. It is only where it "has passed the boundary of legislative and judicial discretion, and is exercising the municipal power arbitrarily to the injury and oppression of the citizen," that judicial interference will be justified. *City of Atlanta* v. *Holliday*, 96 *Ga.* 546. See also *Wells* v. *Mayor*, 43 *Ga.* 67; *Danielly* v. *Cabaniss*, 52 *Ga.* 212 (4); *Mayor* v. *Camak*, 75 *Ga.* 429; *City of Atlanta* v. *Street Railroad Co.*, 80 *Ga.* 276; *Burckhardt* v. *City of Atlanta*, 103 *Ga.* 302.

In the present case, however, under the contract between the city and the predecessor of the plaintiff, and by which it is of course bound, the city expressly reserved the right to require that such changes be made under the direction of its engineer and street committee. It is true that the entire meaning of the contract is by no means clear, but, construing it all together, it is clear that the city reserved the right to require the changes to be made. Whether under the contract the railroad company must pay the entire cost of removal, or whether the city is required to share such expense, is not a question raised by the present record. Under the evidence introduced at the hearing, the court was well warranted in finding that the requirement made of the plaintiff was not capricious, unreasonable, or arbitrary, but that the proposed change was necessary for the convenience and safety of persons living along the street as well as of the general public.

2. It is contended, however, that even conceding that the city had the primary right to require the change in location of tracks to be made, it is estopped to make any such regulation, by virtue of an agreement made between the plaintiff company and the mayor and council, subsequently to the passage of the resolution of July 26, 1899, that the change would not be required of the company, provided it would cease to use a switch connected with the line, and construct a certain kind of turnout on the opposite side of the street. It appears that, pursuant to this agreement, the company dismissed a petition it had pending to enjoin the city from enforcing its resolution of July 26, 1899, and that it has proceeded in good faith to carry out its part of the agreement. It may be that the mayor and council, in endeavoring now to enforce a relocation of the track, has not kept absolute good faith with the company in the matter of this agreement. Be this as it may, we are clear that the agreement itself was beyond the power of the mayor and council. They are the representatives of the public, and are placed in power to conserve the interests of the public. They are, for this purpose, invested with certain governmental and legislative duties, and these can not be bargained away. This agreement is an attempt on the part of the mayor and council to tie their hands, as well as those of their successors, with respect to a matter of great public interest. It is, in effect, a contract on their part that they will not in the future, no matter how much the pub-

lic convenience or safety may demand it, attempt to regulate the location of the tracks of this company in this street.   We are clear that this can not be done.   Municipal corporations "may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties."   1 Dillon, Mun. Cor. (4th ed.) § 97.   See also Ibid. p. 518 (n. 1), § 458.   "A city can not alienate its governmental and police powers."   Elliott's Rds. & Sts. § 805.   "It may be said, generally, that the State, or its duly authorized municipality, may require a street-railway company to do whatever is required for the health, safety, and welfare of the community; for the authority to enact measures for this purpose never passes from the sovereign, no matter what grants it may make."   Ibid. § 758.   "Common councils and municipal boards and officers, clothed with legislative and police powers, can not, either for themselves or their successors, abrogate the authority with which they are invested."   Booth, St. Rwy. L. § 8.   In Wabash Railroad Co. *v.* Defiance, 167 U. S. 88, it appeared that the City of Defiance passed an ordinance authorizing the railroad company to erect new bridges over and across its track where the same crossed certain public streets.   These bridges were erected by the company at great expense.   Subsequently the common council of the city passed ordinances changing the grade of that part of these streets where they crossed the railway track to the level of the railway.   These changes rendered necessary the removal of the bridges.   The railroad company sought to enjoin the enforcement of the ordinances, and set up, among other things, that the ordinances requiring the change of grade were an impairment of the contract contained in the ordinance granting authority to erect the bridges.   The judgment of the Supreme Court of Ohio refusing the injunction was affirmed.   In the opinion Mr. Justice Brown uses the following language:   "While municipalities, when authorized so to do, doubtless have the power to make certain contracts with respect to the use of their streets, which are obligatory upon them [citing authorities], the general rule to be extracted from the authorities is that the legislative power vested in municipal bodies is something which can not be bartered away in such manner as to disable them from the performance of their public functions."   In.

N. Y. & N. E. Rd. *v.* Bristol, 151 U. S. 556, the following language was used: "The governmental power of self-protection can not be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." In Louisville City Rwy. Co. *v.* Louisville, 8 Bush. 416, it appeared that the city had made an agreement with the company by which the latter constructed and operated a line of railroads over certain streets of the city. The agreement specified that the track should be constructed of the "most approved rail." The tracks were laid with "crescent rails," with the consent and approval of the city. Subsequently the city decided to change the pavement used on these streets, and ordered the railway company to take up its tracks and put down "tram-rails," the latter being better suited to the new pavement. The railway company sought to prevent the enforcement of this order, and set up the original agreement with the city under which the crescent rails were used. It was held that the city could not by covenant limit its legislative discretion; and that "the general council could not by contract deprive itself of the power to regulate the reconstruction of railways made necessary by the changes in the character of pavement used upon the streets of the city." See also Karst *v.* Rd. Co., 22 Minn. 118; Bronson *v.* Phila., 47 Pa. St. 329; State *v.* Murphy, 34 L. R. A. (Mo.) 369; Gas Light Co. *v.* Middleton, 59 N. Y. 228; Dingman *v.* People, 51 Ill. 277; Corporation *v.* Mayor, 5 Cowen, 538; Milhau *v.* Sharp, 27 N. Y. 611; Martin *v.* Mayor, 1 Hill, 545; Matthews *v.* Alexandria, 68 Mo. 115; Gale *v.* Kalamazoo, 23 Mich. 344.

The City of Macon having no power to make a contract whereby it surrendered its power to require the plaintiff in error to move its tracks from one part of the street to another, whenever such removal was necessary for the public welfare, such an agreement made by the city can not be used as the foundation for an estoppel to prevent the city from exercising its discretionary power to require such a change to be made. See, in this connection, Bigelow, Estop. (5th ed.) 466, 467; Snyder *v.* City, 52 N. E. (Ill.) 62; *Laing* v. *Americus*, 86 *Ga.* 758. There is no decision of this court which conflicts with the ruling here made. In *City of Atlanta* v. *Gas Lt. Co.*, 71 *Ga.* 125, the city had authority to consent for the streets

to be used by the gas company, and, having such authority, when it stood by and saw the gas company expend large sums of money in laying pipes in certain streets of the city, it would be thereafter estopped from denying the right of the company, under its charter from the State, to lay its pipes. The same distinction is to be noted in the case of *Mayor of Athens* v. *Georgia Railroad*, 72 *Ga.* 800. It was ruled in *Laing* v. *Americus,* supra, that there could be no estoppel where there was no power to consent. In *City Council* v. *Burum,* 93 *Ga.* 68, it was ruled that there would be an equitable estoppel against a "needless or capricious" revocation of a license to erect and maintain awnings over a sidewalk, until sufficient time had elapsed to allow those who had thereby incurred expense to realize, in the way of use and enjoyment, a fair return for their outlay. In that case the city had a right to grant the license, and was attempting to revoke it needlessly and capriciously. The City of Augusta did not undertake to contract that it would never, even if the public safety demanded it, require reasonable changes to be made in the construction and location of these awnings, and its right to do so was not involved in that case. That case is wholly dissimilar from the present one, and governed by an entirely different principle. Our conclusion is that the court did not err in refusing to grant the injunction.

*Judgment affirmed. All the Justices concurring.*