34798.   CITY OF MACON *v.* SOUTHERN BELL
TELEPHONE & TELEGRAPH COMPANY.

Decided November 10, 1953—Rehearing denied November 25, 1953.

*E. S. Sell, Jr., Carlton Mobley,* for plaintiff in error.

*Martin, Snow & Grant, Ed Smith,* contra.

GARDNER, P. J. This proceeding was brought for a declaratory judgment under the provisions of the act of 1945 (Ga. L. 1945, pp. 137, 139), for the purpose of determining the liability of the City of Macon to defray the cost of removing the underground cables of the telephone company from a certain location on New Street in said city, which had been closed by the city. The act of the city, the telephone company urged, amounted to a taking of its property without just compensation being paid, in violation of the State and Federal Constitutions. The company contends that by virtue of the provisions of Code § 104-205, and under the contract between it and the city, it was granted and now possesses such a right in and to the portion of New Street, wherein it laid an underground conduit for cables and wires used by it in supplying telephone service to the city and to the people thereof, as entitled it to have the City of Macon defray the

expense of removing same to a new location, provided by the city when the city closed that portion of New Street for the purpose of enlarging the Macon City Hospital. The case was tried before Hon. A. M. Anderson, Judge of the Superior Court of Bibb County without the intervention of a jury, who after hearing the evidence rendered judgment against the city for the cost of removing the telephone cables from beneath the surface of the ground on New Street to the new location provided by the city. In 1889 Code § 104-205, as the same now reads, came into existence (Ga. L. 1889, p. 141, amended in 1905, Ga. L. 1905, p. 79). The pertinent portions of this section are as follows: "Any telegraph or telephone company, chartered by the laws of this or any other State of the United States, shall have the right to construct, maintain, and operate telegraph or telephone lines, or both, upon, under, along, and over the public highways of this State, with the approval of the county or municipal authorities in charge of such highways."

New Street is under the control of the City of Macon, and the approval of the municipal authorities was obtained so that said company became entitled to lay the conduit along this portion of New Street. The record discloses that through contract the city authorities gave to the telephone company a franchise and right to lay its lines, including underground cables, along the streets of the city. In fact, the telpehone company has been serving the city and the public for many years, this service being inaugurated by the predecessor public utility of Southern Bell Telephone & Telegraph Company in 1880; and it had been doing so for many years at the time the conduit involved was placed beneath the surface of New Street at this point. At that time there was in existence a city ordinance providing the manner in which excavations could be made in the streets of the city, and, that a permit to do so had to be obtained from the city engineer and certain rules and regulations had to be complied with and followed and a bond posted. The company complied with this city law, and in 1946 laid the conduit in question. The company claims that under this State law and its franchise with the City of Macon, it thus acquired such an easement and property right in that portion of New Street under which this conduit was laid that it could be deprived thereof by the city only upon the

city's compensating it fully for its property right and for damages sustained, which would be in the instant case the cost or expense and damages consequent to a removal of this conduit to a new location provided by the city for the telephone company. With this conclusion we do not agree. We do not place such construction on the statute above quoted from.

The city owns and operates the Macon City Hospital by virtue of express legislative authority. It developed that the hospital facilities were inadequate to meet the needs of the city under its present population, and it was decided to increase and enlarge such facilities. It was ascertained that this could be best done by adding to the present facilities. In order to do this, it was decided to close that portion of New Street bounding the block (73) on which the hospital was then and is now situated and to extend the buildings over the closed portion of the street and onto the adjoining block or city square (74). An expert engineer was engaged by the city, and he advised that this would be the most feasible and economical way of providing the necessary and increased hospital facilities. The city adopted this plan and a bond election was called and held. At this election the people of the city voted to issue general obligation bonds; these have been sold. The city now has on hand some $4,000,000, which it proposes to use with certain Federal and State grants to construct the needed hospital buildings. Thereupon the city authorities advised the telephone company to remove and relocate its underground conduit from beneath that portion of said street to be closed. In 1953 the General Assembly granted to the city title to the part of said street involved, and the authority to close, vacate, and abandon the same. This street is now closed and has been dedicated by the city to hospital purposes. The Macon City Hospital is owned, operated, and maintained by the city for both pay and charity patients; and while those who are able to do so are required to pay for hospital treatment, those who are unable to pay for such treatment are afforded the same kind and class of hospital service. A public need is met and served by the City of Macon through the operation of this institution. It is carried on by the city not for private gain, but as a public service for the welfare of the people of Macon. It is contended by the telephone company that the city is acting in

a proprietary rather than a governmental capacity in owning and operating this hospital. The City of Macon is authorized to establish and maintain a public hospital. "The maintenance of such an institution may well be regarded as in a measure incidental and necessary to the security and preservation of the health and well-being of the citizens, who, in the hour of need, require the care and attention of such skilled nurses and physicians as may be selected and employed by the officials who are elected or appointed by the municipal authorities to conduct the hospital and render the services requisite and proper for such an institution." *Watson* v. *City of Atlanta,* 136 *Ga.* 370, 371 (71 S. E. 664). See also *Love* v. *City of Atlanta,* 95 *Ga.* 129 (22 S. E. 29). The fact that the Macon hospital authorities charge fees from some of the patients is not at all inconsistent with the character of the hospital as a public institution and one operated by the city in the performance of its governmental duties. It does not appear that the city operates this hospital primarily as a profit-making enterprise. *City of Columbus* v. *Webster,* 51 *Ga. App.* 270 (180 S. E. 512). The City of Macon in the operation of this hospital is taking such steps and measures as it can and deems necessary to the preservation of the public health and welfare of its people and is in the discharge of purely a governmental function. Therefore it follows that the public need of the people of Macon for a hospital adequate to afford medical aid to the increased population is necessary to the preservation of the health and welfare of the people of Macon; and the city has the power and authority to take such steps as are proper to supply that need and to preserve the health and welfare of its people. There is a public necessity existing for increased municipal hospital facilities. Likewise, public convenience and necessity are served by the maintenance and operation of telephone service in the city. Public need requires an enlargement of the municipal hospital facilities. Using the facilities on hand and adding thereto has been determined to be the most feasible and economical method of supplying these increased facilities.

The telephone company, when the franchise was granted to use the streets of the city for installing its telephone facilities, acquired no indefeasible right to any particular street or part of a street, and it took this grant subject to the right of the city

to require a change of location of the telephone lines if good reasons existed therefor. See 12 McQuillin on Municipal Corporations (3rd ed.), 253, 255, § 34.77, and authorities on which the text is based. Here the right to use the streets of Macon for laying the underground conduit was not denied, but the city provided a place to relocate the conduit. As stated by the New York Court of Appeals in the recent case of New York City Tunnel Authority v. Consolidated Edison Co. of New York, 295 N. Y. 467 (68 N. E. 2d 445), "The 'fundamental common law right applicable to franchises in streets' is that a utility company must relocate its facilities in the public streets when changes are required by public necessity"; and that, "although authorized to lay its pipes in the public streets, the company takes the risk of their location and is bound to make such changes as the public convenience and security require, at is own cost and charge." Also reference is made to Readfield T. & T. Co. v. Cyr, 95 Me. 287 (49 Atl. 1047). The Supreme Court of the United States in New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453 (25 Sup. Ct. 471, 49 L. ed. 831), stated that the gas light company was granted an exclusive franchise to furnish gas within the City of New Orleans and had laid beneath the surface of the streets thereof pipes wherein this gas was conducted to consumers. The drainage commission had legislative authority and power to construct a drainage system for the city. Obviously, this drainage construction was essential to the welfare and health of the people of New Orleans and was created and empowered for this reason. In carrying out the drainage construction, it became necessary that the underground conduits of the gas company in certain localities or along certain streets and parts of streets be moved. The public-service corporation proceeded to move these pipes under a "non-prejudice" contract and agreement and then instituted proceedings to determine the liability for the cost of this removal. The Supreme Court held that it would be unreasonable to rule that, in the grant to the gas company of the franchise to use the city streets to lay its gas pipes, it was even intended to impair the right to discharge the duty of conserving the public health of the city; that the gas company acquired no specific location in the city streets, but only the general right to use

them; and that, when it laid any such gas pipes, it did so at the risk that they might be disturbed at some future date if it should appear that it was necessary to do so for the public good. The court stated: "Every reason of public policy requires that grants [of rights] in" the soil beneath the streets in cities "shall be held subject to such reasonable regulation as the public health and safety may require"; and that the right acquired by the gas company to use these streets was subject, "insofar as the location of its pipes was concerned, to such future regulation as might be required in the interest of the public health and welfare." The court then ruled that "uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation," and in the court's view "that is all there is to this case." The court continued: "The gas company, by its grant from the city, required [acquired] no exclusive right to the location of its pipes in the streets as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the State, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense, none of the property of the gas company has been taken, and the injury sustained is damnum absque injuria." Shortly thereafter, the United States Supreme Court in another case made substantially the same ruling as in the New Orleans case. Chicago &c. Ry. Co. v. People of the State of Illinois, 200 U. S. 561 (26 Sup. Ct. 341, 50 L. ed. 596). In the latter case, it appeared that the railroad had been required to remove and rebuild at its own expense a bridge and culvert over a drainage channel, where such removal and rebuilding was caused by the act of the drainage district in widening and deepening the channel. The court said: "Without further discussion, we hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers and stones placed there by it and also . . . to erect at its own expense and maintain a new bridge for crossing that will conform to the regulations

established by the drainage commissioners, under the authority of the State; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws."

It cannot be said that the City of Macon, in closing this portion of New Street and in requiring the removal therefrom of the underground cable conduit—providing at the time another location for such cables—acted arbitrarily and capriciously, and that no public need existed for this relocation of the telephone company's facilities. It is not contended by the company that the method adopted by the city to increase and enlarge its hospital facilities was not the most feasible and economical. So, applying to our present question the holdings and reasoning of the United States Supreme Court and other eminent authorities, there has been no unreasonable action on the part of the City of Macon, resulting in the taking of the property of the telephone company without just compensation being paid nor has there been any denial to that company of the equal protection of the laws. The company had no vested right to any particular street or portion of a street in the City of Macon. There was no grant thereof attempted by any contract between the city and the telephone company and none was ever intended. The provisions of Code § 104-205, supra, conferred no such right on the telephone company. The company acquired by virtue of said statute, as well as under contract with the city, only the right to use generally the public streets of said city for the purpose of installing the facilities with which it furnishes telephone service to the public. When the company excavated in New Street and laid the underground conduit in this portion of the street, it did so at the risk that such underground conduit might be disturbed at some future date if it should appear that it was necessary to do so for the public good. The right of the telephone company to use the streets of Macon was acquired by it subject to such reasonable regulation as the public health and safety of the community might require. As far as the location of the telephone cables underneath this particular portion of New Street was concerned, it was subject "to such future regulation as might be required in the interest of the public health and welfare."

Our ruling that, by the provisions of Code § 104-205, the telephone company acquired no vested right to any specific location beneath the streets of Macon, and hence none to the portion of New Street closed for the purpose of construction of the required increased hospital facilities, is supported by the decisions of our Supreme Court. In *Cleveland* v. *City of Augusta,* 102 *Ga.* 233 (29 S. E. 584, 43 L. R. A. 638), it was ruled: "A railroad corporation which under its charter constructs its tracks across an existing public highway or street of a city, does so on the implied condition that it will yield to the reasonable burdens imposed by the growth and development of the country or the city, and where the public welfare demands a change of the grade of the highway or street, the railroad company must, at its own expense, make such alterations in the grade of its crossing as will conform to the new grade." In the same opinion, at page 238, the court said: "Where a railroad is laid in a public street, under a permissive grant to the company to use a portion of the street for that purpose, the company does not acquire the same unqualified title and right of disposition to the land occupied which individuals have in their lands. The only exclusive power conferred by such grants is that of using railroad carriages, in the same manner as the grant of a stage line confers, for the time being, the grant of a monopoly of using such stages for the transportation of passengers for hire on that route." In the *Cleveland* case an Illinois decision was quoted from with approval, to the effect that every railroad company takes the right-of-way subject to the right of the public to extend the public highways and streets across such right-of-way. In Chicago & Alton R. Co. *v.* Joliet, L. & A. Ry. Co., 105 Ill. 388, 401, it was held: "Unless, therefore, every railroad corporation takes its right-of-way subject to the right of the public to have other roads, both common highways and railways, constructed across its track whenever the public exigency might be thought to demand it, the grant of the privilege to construct a railroad across or through the State would be an obstacle in the way of its future prosperity, of no inconsiderable magnitude." Our court said in the *Cleveland* case, at page 239, that railroad companies in such cases are "subject to the control of the police power of the State—that power of which this court has said: 'It may be as-

sumed that it is a power coextensive with self protection, and is not inaptly termed the law of overruling necessity.'" The court held that the police power as to protection of the lives, health, and property of persons included the power to require a railroad company to maintain adequate and safe crossings; and that "Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not a taking or damaging, without just compensation, of private property or of private property affected with a public interest" (at p. 240, quoting from 166 U. S. 255). The court said in the *Cleveland* case (at p. 242), quoting from Chicago, B. & Q. R. Co. *v.* Chicago, 166 U. S. 226 (17 Sup. Ct. 581, 41 L. ed. 979), "The State cannot free any person or corporation from subjection to this power. All personal or property rights must be held subject to the police power of the State"; and ruled that a railroad acquired its right-of-way along a public highway or street subservient to the right of the public, and that, "We know of no law whereby a corporation or natural person can recover damages on account of being compelled to render obedience to a public regulation designed to secure the common welfare" (citing Chicago & Alton R. Co. *v.* Joliet &c. Ry. Co., supra).

This court, in *Carver* v. *State,* 11 *Ga. App.* 22, 25 (74 S. E. 556), following the case of Richmond *v.* Southern Bell T. & T. Co., 174 U. S. 761 (19 Sup. Ct. 778, 43 L. ed. 1162), ruled that the right of a telegraph or telephone company to use the public roads of this State in order to construct its lines for transmission of interstate messages, granted by Act of Congress, "is to be enjoyed in subordination to public use and private rights, and subject to any lawful exercise of the police power belonging to the State or to its municipalities or counties." Also see *A. & B. R. Co.* v. *City of Cordele,* 128 *Ga.* 293 (57 S. E. 493) ; *Macon Consol. St. R. Co.* v. *City of Macon,* 112 *Ga.* 782 (38 S. E. 60).

This seems to us to be all there is to the present case. A city can require a public-service company, to which it has granted a franchise to use the streets of the city, to remove its facilities from a portion of one street to another location, where it appears that the portion of the street whereon such facilities are located is closed and dedicated to the use of the municipal hospital, it appearing that the public health and welfare require the use

thereof for hospital purposes; and the company and not the city must bear the cost of removal and relocation. We agree with the decision of the United States Supreme Court in City of Louisville v. Cumberland T. & T. Co., 224 U. S. 649 (32 Sup. Ct. 572, 56 L. ed. 934), that a franchise granted to the telephone company by the legislature could not, of course, be repealed, nullified, or forfeited by any ordinance of a general council; and that the plaintiff company here, by virtue of the provisions of Code § 104-205, holds its right to use the streets of the City of Macon by virtue of a franchise from the State. However, no effort has been made or is being made to repeal, nullify, or forfeit the right or franchise of this telephone company to use the streets of Macon for providing telephone service to its patrons. There is nothing to the contrary of what we now hold in the case of Russell v. Sebastian, 233 U. S. 195 (34 Sup. Ct. 517, 58 L. ed. 912). The telephone company may use any and all the streets of the city, but its use is only a general one and is subject to police power of the State through the city exercised for the welfare and health of its citizens. And when this is done, no constitutional impairment of a right of the company takes place.

There is no doubt but that the telephone company had the right in the performance of its public service as to transmission of telephone messages and calls, both local and long distance, to the use of the streets of the City of Macon; and we do not gainsay the proposition, insisted upon by counsel for the telephone company, that a municipality, by permitting the location and construction of the lines of a telephone or telegraph company along the streets and highways for a considerable length of time and dealing with the company so as to evince its approval of the occupancy of such streets and highways, may be estopped from asserting that the company has not procured its approval to use the streets, as has been ruled many times in such cases as Town of Essex v. New England Tel. Co. of Mass., 239 U. S. 313 (36 Sup. Ct. 102, 60 L. ed. 301) and *City of Atlanta* v. *Gate City Gas Light Co.*, 71 *Ga.* 106, 125. However, the proposition here is not that the City of Macon is seeking in any manner to deny the right of the telephone company to use its streets for laying underground cables, but that the company in its acquisi-

tion of this right did so subservient to the public health and welfare; and where, as here, that welfare requires the city to exercise its police power and require a removal of the underground cable from one location to another, this does not amount to a taking of the property of the telephone company without just compensation being paid, or to a denial to it of the equal protection of the laws. The telephone company had only a right to the general use of the streets of Macon, and had no vested right, which could not be disturbed, in any particular street or portion of a street of the city.

There are many cases, not specifically mentioned and dealt with in this opinion, which tend to support strongly the conclusions herein reached and the ruling made. Counsel for the City of Macon and counsel for Southern Bell Telephone & Telegraph Company have furnished this court with able and comprehensive briefs and illuminating argument. However, after careful consideration thereof and the authorities investigated, it is our opinion that the case is controlled by the apt statement in the ruling of this court as well as by the rulings of the United States Supreme Court and our own Supreme Court, and as aptly expressed in *Carver* v. *State,* supra, by former Chief Judge Hill of this court, in dealing with the property rights of public-service corporations, to the effect that any franchise granted to a public utility to use the public roads, highways, and streets of a State, county or city, in the carrying on of the publicly affected business of such utility corporation, "is to be enjoyed in subordination to public use and private rights, and subject to any lawful exercise of the police power belonging to the State or to its municipalities or counties."

As stated by the author McQuillin (12 McQuillin on Municipal Corporations, 3rd ed., 243, § 34.74): "The grant by a municipality to a public service company of the right to use streets does not divest the municipality of its police power over the grantee in relation to its use of such streets. Furthermore, it is well settled that it is not within the power of a muncipality, in any franchise it may confer upon or contract with, a public utility company, to divest itself of its governmental police power, the exercise of which is necessary for the public welfare and the preservation of the public safety. Nor can a municipality grant

away or limit the police powers conferred upon it by the legislature." In *Macon Consol. St. R. Co.* v. *City of Macon*, 112 *Ga.* 782, supra, it is ruled: "A municipal corporation cannot make a valid contract abrogating or restricting its legislative or discretionary power; and an agreement by which a city undertakes to divest itself of such power cannot be used as the foundation for an estoppel against it." On page 784 of that opinion, the Supreme Court, speaking through Mr. Justice Cobb, said: "Is a regulation by a city requiring a street-railroad company to remove its tracks from one part of a street to another a legitimate exercise of its legislative power? We think it is, provided the proposed change is not arbitrarily and capriciously required by the city, but is really necessary for the convenience and welfare of the public. . . The municipal authorities must necessarily, in the exercise of their discretion, be left to determine the necessity and propriety of the proposed change. The courts will not readily interfere with the governing authorities of a city in the performance of a discretionary act. It is only where it 'has passed the boundary of legislative and judicial discretion, and is exercising the municipal power arbitrarily to the injury and oppression of the citizen,' that judicial interference will be justified." The public utility like the private citizen must so use its property or rights as not to injure others in the use thereof. "The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people; and herein is found the principle—so use your own property or so conduct yourself as not to unnecessarily injure or annoy others—which is the root from which the whole doctrine of the police power grows. To protect the health of the public, the sale of provisions has been regulated and abridged, and dealers have been required to submit them to inspection by a public officer; in the interest of public morals, the sale of liquors has been prohibited, licenses to manufacture them have been recalled, the manufacture thereof prohibited after much expenditure by the licensees; lotteries chartered for a consideration, suppressed; to secure the life and safety of the public, the builder is often compelled to use in his structure more expensive material and adopt more expensive appliances

than he otherwise would; infected places are disinfected and infected clothing destroyed; all at the expense of the unfortunate owner; one who has been stricken with a fatal and contagious malady must repair to the quarantine station; in the emergency of danger from fire, private buildings may be torn down and private property otherwise destroyed without compensation, to prevent a greater destruction from the conflagration." *Cleveland* v. *City of Augusta,* supra, pp. 244, 245. Of Chicago, B. & Q. R. Co. *v.* Chicago, 166 U. S. 226, supra, the court said: "The court, in affirming the legislative power to impose uncompensated duties and even burdens upon individuals and corporations for the general safety, speaking with reference to the police power, says: 'Its proper exercise is the highest duty of government. The State may in some cases forego the right to taxation, but it can never relieve itself of the duty of providing for the safety of its citizens. This duty, and consequent power, override all statute or contract exemptions. The State cannot free any person or corporation from subjection to this power. All personal or property rights must be held subject to the police power of the State', citing 97 U. S. 25; 101 U. S. 814; 111 U. S. 746." See *Cleveland* v. *City of Augusta,* supra, pp. 242, 243.

So it follows that whatever construction could be placed on any contractual franchise right granted by the city to the telephone company, the city could not by contract or otherwise override the police power imposed in it. Neither could the State through Code § 104-205 do away with its constitutional power to require the plaintiff telephone company to remove its underground conduit from a specific locality to another locality at its own expense, where such removal is necessitated for the safety, protection, welfare, and health of the citizens. Under no construction of the provisions of the Code or of the contract with the city or of any municipal ordinance, can the telephone company acquire a right to use the public highways of the State or the streets which would not be subordinate to the "public use and private rights, and subject to any lawful exercise of the police power belonging to the State or to its municipalities or counties."

It follows that the judgment of the superior court, without a jury, finding the City of Macon liable for damages consequent

upon the removal of the conduit from New Street, is contrary to the law and the facts.

*Judgment reversed. Townsend and Carlisle, JJ., concur.*